NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

T.L.,                                    )
                                         )
        Petitioner,                )
                                         )
v.                                       )          Case No. 2D18-1089
                                         )
F.M.,                                    )
                                         )
        Respondent.                )
_____ )

Opinion filed March 13, 2019.

Petition for Writ of Prohibition to the Circuit
Court for the Sixth Judicial Circuit for
Pinellas County; Pamela Campbell, Judge.

Ita M. Neymotin, Regional Counsel, Fort
Myers, and Ngozi C. Acholonu, Assistant
Regional Counsel, Clearwater, for
Petitioner.

F.M., pro se.

Ashley Moody, Attorney General,
Tallahassee, and Caroline Johnson Levine,
Assistant Attorney General, Tampa, for the
State of Florida.


PER CURIAM.

        T.L. petitioned for a writ of prohibition or a writ of habeas corpus quashing

the circuit court's ex parte order authorizing law enforcement to transport her to a

treatment facility for involuntary substance abuse assessment and stabilization under Florida's Marchman Act.  <u>See</u> §§ 397.6811–397.6822, Fla. Stat. (2017).  We denied her petition in a prior order on May 8, 2018, indicating that an opinion would follow.  However, since that time T.L. has unfortunately passed away.  We therefore vacate our previous denial and now dismiss the case as moot.


NORTHCUTT and CASANUEVA, JJ., Concur.
LUCAS, J., Concurs specially with an opinion in which CASANUEVA, J., Concurs in part with opinion.

LUCAS, Judge, Concurring separately.

A written accusation by an itinerant houseguest friend followed by a judge's review of that piece of paper is all it would have taken under the Marchman Act to deprive a young woman of five or more days of her liberty. It is difficult for me to reconcile the constitutionality of such a drastic deprivation of freedom with the patina of procedure that precedes it. Therefore, while I must concur with the dismissal of T.L.'s case because it has become moot, I write to address the due process arguments her attorney has raised in her petition. They merit attention—and in the right case, perhaps, some action on the part of a court.

I.

A.

On March 19, 2018, F.M. filed a petition in the circuit court of Pinellas County to have T.L. involuntarily assessed and stabilized under Florida's Marchman Act, §§ 397.301–.998, Fla. Stat. (2017).[1] He alleged that T.L. "has no control over the urge to use drugs," that she sometimes suffered from convulsions related to her drug use, and that she was engaged in prostitution in order to maintain her drug addiction.

---

[1]The Marchman Act was enacted in 1993 to provide substance abuse prevention, intervention, and treatment services. Ch. 93-39, Laws of Fla. (1993); § 397.305, Fla. Stat. (1993). Under the Act, there are two court-ordered involuntary admission procedures: "involuntary assessment and stabilization" and "involuntary treatment." See generally Cole v. State, 714 So. 2d 479, 481–85 (Fla. 2d DCA 1998) (providing a detailed discussion and overview of the Marchman Act's structure, including its court-ordered involuntary admission provisions). The involuntary treatment procedure, which is not at issue here, is focused on long-term treatment and can last for up to sixty days. See §§ 397.693–.6978, Fla. Stat. (2017). The involuntary assessment and stabilization procedure, which is the subject of this case, is a shorter-term procedure that authorizes a court to order an allegedly substance-abuse-impaired person (referred to as a "respondent") to undergo an involuntary clinical assessment and stabilization. See §§ 397.6811–.6822.

F.M. described himself in his petition as T.L.'s friend, an occasional houseguest of hers, and an emergency contact. The same day as the petition's filing, the circuit court entered an ex parte order finding that the allegations in the petition presented a good-faith basis to believe that T.L. met the criteria for involuntary admission and stabilization under section 397.675. In that order, the court also appointed regional counsel to represent T.L., issued a summons to T.L., and authorized law enforcement to take T.L. into custody and deliver her to a licensed substance abuse service provider in Tampa.

On March 21, T.L.'s appointed attorney filed a petition for writ of prohibition (or habeas corpus in the event that she was taken into custody) seeking to quash the circuit court's order on three bases: (1) F.M. was not a qualified petitioner under the Marchman Act, so his petition did not properly invoke the circuit court's jurisdiction; (2) the ex parte procedure that the circuit court employed violated T.L.'s right to due process because it did not provide her with a hearing and an opportunity to be heard; and (3) the assessment and stabilization statute as a whole is unconstitutionally vague because it does not provide enough guidance to courts regarding when to hold a predeprivation hearing and when to employ the ex parte procedure. Although the State was not a formal party to this petition, our court ordered it to file a response addressing the constitutional issues raised. See Fla. Carry, Inc. v. Univ. of N. Fla., 133 So. 3d 966, 991 (Fla. 1st DCA 2013) (Makar, J., concurring) (opining that the State should be given an opportunity to be heard when constitutional issues arise); cf. § 86.091, Fla. Stat. (2017) (requiring that the State be served and given an opportunity to be heard when a constitutional challenge is made in an action for declaratory relief).

The State's initial response to T.L.'s petition was remarkable.  At first, the State conceded that T.L. "had established grounds for this Court to grant the petition" and allowed that if T.L. were entitled to relief, our court "should rule accordingly."  Later, however, the State filed an amended response, which raised arguments that focused almost entirely on what the State perceived to be procedural shortcomings with T.L.'s petition—the petition's mootness, the impropriety of seeking habeas relief when T.L. had not been taken into custody, the unavailability of a writ of prohibition in this case, and the fact that T.L.'s counsel did not file a written motion with the circuit court.  With respect to T.L.'s due process argument, the State had relatively little to say.  According to the State, the Marchman Act did not violate T.L.'s due process rights as it "is not a state law which seeks to unfairly imprison individuals, rather, it authorizes the courts to provide medical treatment to individuals in need of substance abuse treatment."

In other words, so long as her confinement would have been for her own good, we ought not to worry too much about due process for those in T.L.'s circumstances.

B.

The arguments underlying T.L.'s due process challenge pose vitally important questions concerning the validity of the ex parte involuntary assessment and stabilization procedures outlined under the Marchman Act.  Those procedures, in essence, authorize courts to issue ex parte orders for "the involuntary assessment and stabilization" of a respondent whenever a written petition sufficiently alleges that the respondent meets the criteria of section 397.675, and to order involuntary commitment in a hospital, licensed detoxification facility, or addictions-receiving facility "for a period

- 5 -

of 5 days" in order to assess and stabilize the respondent. §§ 397.6811–.6822. The written petition instigating this involuntary assessment and stabilization procedure may be filed by any adult "who has direct personal knowledge of the respondent's substance abuse impairment." See § 397.6811(1). A court issuing an ex parte order under this procedure does not convene a hearing of any kind prior to or immediately after the order's issuance; the court is instead directed to "rely[] solely on the contents of the petition." See § 397.6815(2). In conjunction with issuing its order, the court need not notify any other person, such as a spouse or family member, who might intervene on a respondent's behalf. Although a respondent is supposed to be assessed by a "qualified professional"[2] within seventy-two hours of his or her involuntary commitment for the purpose of determining whether he or she meets the criteria for involuntary admission pursuant to section 397.675, under section 397.6821 a service provider may request additional time to assess and stabilize an individual in its care, on which the court may (again, without a hearing) grant additional time for the confinement "not to exceed 7 days after the date of the renewal order." Section 397.6821 further provides that such an extension "constitutes legal authority to involuntarily hold the individual for a period not to exceed 10 days in the absence of a court order to the contrary." The length and location of one's prehearing confinement may vary, but there is no provision for a

---

[2]Under section 397.311(34), a qualified professional can be a physician, licensed physician assistant, a professional licensed under chapters 490 (psychologists) or 491 (licensed social workers, mental health counselors, and marriage and family therapists) of the Florida Statutes, advanced practice registered nurses, "or a person who is certified through a department-recognized certification process for substance abuse treatment services who holds, at a minimum, a bachelor's degree." If the assessing professional is not a physician, section 397.6819 requires a physician to review the professional's assessment before the expiration of the assessment period.

judicial hearing at any time during the initial five-day assessment and stabilization confinement under the Marchman Act.

In her petition, T.L. contended that this statutory procedure violates the procedural due process protections afforded under the Fifth and Fourteenth Amendments to the United States Constitution.[3]  Her argument can be stated succinctly: a court may not deprive a person of his or her physical liberty without meaningful notice and an opportunity to be heard; the ex parte involuntary assessment and stabilization procedure under the Marchman Act authorizes a court to order a person to be seized and involuntarily confined for five or more days without a meaningful opportunity to be heard by the court at a hearing; therefore, the statutory procedure is unconstitutional.

I am inclined to agree with T.L.'s argument.

II.

To begin, it is important to identify the type of review T.L.'s constitutional challenge would have implicated, as that would necessarily dictate the kind of constitutional analysis needed to resolve the arguments in her petition.  See Kuvin v.

_____

[3]The Fifth Amendment, which applies to Florida through the Fourteenth Amendment, see Maryland v. Shatzer, 559 U.S. 98, 103 (2010) (citing Malloy v. Hogan, 378 U.S. 1, 6 (1964)), provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," Amen. V, U.S. Const.  T.L.'s petition included no argument that the involuntary commitment procedures under the Marchman Act might have also violated article I, section 9 of the Florida Constitution.  Cf. State v. Goode, 830 So. 2d 817, 825-26 (Fla. 2002) ("Civil commitment proceedings involve a serious deprivation of liberty and, thus, such proceedings must comply with the due process clauses of the Florida and United States Constitutions." (first citing Addington v. Texas, 441 U.S. 418, 425 (1979); and then citing Pullen v. State, 802 So. 2d 1113, 1117 (Fla. 2001))).

City of Coral Gables, 62 So. 3d 625, 629 (Fla. 3d DCA 2010) ("The first issue in every case considering the constitutionality of a statute or ordinance is which standard applies. Not only is the applicable standard the threshold determination in any constitutional analysis; it is often the most crucial. In this case, it has made all the difference." (quoting State v. J.P., 907 So. 2d 1101, 1120 (Fla. 2004) (Cantero, J., dissenting))). Because section 397.6815(2) directly impacts the fundamental right of physical liberty, and it does so without the imprimatur of a judicial hearing, I believe a court should review this section under strict scrutiny. See, e.g., Fla. Dept. of Children & Families v. F.L., 880 So. 2d 602, 607 (Fla. 2004) ("When a statute impinges on a fundamental liberty interest, we analyze the statute's constitutionality under a strict scrutiny standard." (citing Beagle v. Beagle, 678 So. 2d 1271, 1276 (Fla. 1996))); J.P., 907 So. 2d at 1109 ("When a statute . . . impairs the exercise of a fundamental right, then the law must pass strict scrutiny." (first citing Reno v. Flores, 507 U.S. 292, 302 (1993); and then citing Mitchell v. Moore, 786 So. 2d 521, 527 (Fla. 2001))); cf. T.M. v. State, 784 So. 2d 442, 444 (Fla. 2001) (accepting State's concession that the constitutionality of a juvenile curfew ordinance would be subject to strict scrutiny).[4] In

---

[4]I recognize that the U.S. Supreme Court has yet to apply strict scrutiny when reviewing the constitutionality of a state civil commitment statute. See Foucha v. Louisiana, 504 U.S. 71, 119 (1992) (Thomas, J., dissenting) (observing that the Supreme Court "has never applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill" (emphasis omitted)). Two points should be borne in mind. First, unlike T.L.'s petition, the constitutional challenges the Court has addressed with respect to civil commitment mostly involved posthearing confinements. Cf. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148, 1155 (D.C. Cir. 2004) ("It has been pointed out often enough that, in considering such a claim, [whether heightened scrutiny applies to a governmental act burdening a fundamental right,] much turns on the level of generality at which the asserted fundamental right is defined."). Second, even in that context, the Court has not rejected the proposition that strict scrutiny could be appropriate.

order for this ex parte initial confinement procedure to pass strict scrutiny, the State must show that the statute is "designed to advance a compelling state interest by the least restrictive means." Palm Harbor Spec. Fire Ctrl. Dist. v. Kelly, 516 So. 2d 249, 251 (Fla. 1987).

Without question, T.L. had a significant liberty interest at stake when the circuit court's ex parte order issued pursuant to section 397.6815(2). See Shuman v. State, 358 So. 2d 1333, 1335 (Fla. 1978) (addressing Florida's Baker Act and noting that "[t]he deprivation of liberty which results from confinement under a state's involuntary commitment law has been termed a 'massive curtailment of liberty' " (quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972))). T.L. would have found herself seized, taken away, and held against her will in a secure facility. Within the confines of wherever she would have been taken, the freedoms she would have ordinarily enjoyed—to go where she pleases, do what she wishes, pass the time as she chooses—would have been subject to the facility's "assessment and stabilization" of her person. There are few greater incursions that could be made against a person's constitutionally protected liberties. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992))); Addington v. Texas, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); Cruzan by Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 287 (1990) (O'Connor, J., concurring) ("Because our notions of liberty are inextricably entwined with

our idea of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause.").

As such, individuals like T.L. would unquestionably have a right to the protection of due process in connection with their seizure and confinement under this statute. See Vitek v. Jones, 445 U.S. 480, 492 (1980) (holding that civil commitment to a mental hospital "requires due process protection" (first quoting Addington, 441 U.S. at 425; and then citing O'Connor v. Donaldson, 422 U.S. 563, 580 (1975) (Burger, C.J., concurring))); Hillsborough County v. Albrechta, 841 So. 2d 644, 645 (Fla. 2d DCA 2003) ("Because due process is implicated, we conclude that a defendant has a constitutional right to be represented by counsel in Marchman Act proceedings."); cf. Doe v. State, 217 So. 3d 1020, 1026 (Fla. 2017) (explaining that individuals confined under Florida's Baker Act are entitled to "the strict enforcement of their fundamental due process rights" and that "[c]ourts must be especially careful to protect those due process rights when dealing with a vulnerable segment of the population and making a decision that ultimately results in a 'massive curtailment of liberty' " (quoting Humphrey, 405 U.S. at 509)).

The foundation of procedural due process is notice and an opportunity to be heard. See In re Oliver, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence . . . ."); Scull v. State, 569 So. 2d 1251, 1252 (Fla. 1990) ("The essence of due process is that fair notice and a reasonable opportunity to be heard must be given to interested parties before judgment

is rendered." (citing <u>Tibbets v. Olson</u>, 108 So. 679, 688 (Fla. 1926) (Whitfield, J., concurring))); <u>Stern v. Horwitz</u>, 249 So. 3d 688, 691 (Fla. 2d DCA 2018) ("It is fundamental that due process guarantees to a party notice and an opportunity to be heard before his rights are taken away from him by order, decree[,] or judgment of any court." (quoting <u>Arena Parking, Inc. v. Lon Worth Crow Ins. Agency</u>, 768 So. 2d 1107, 1111 (Fla. 3d DCA 2000)))); <u>E.I. DuPont De Nemours & Co. v. Lambert</u>, 654 So. 2d 226, 228 (Fla. 2d DCA 1995) ("Due process mandates that in any judicial proceeding, the litigants must be afforded the basic elements of notice and opportunity to be heard."). The Supreme Court in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976), summarized the parameters of what the opportunity to be heard must entail:

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.
>
> . . . .
>
> The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."

<u>Id.</u> at 332-33 (citations omitted) (first quoting <u>Joint Anti-Fascist Comm. v. McGrath</u>, 341 U.S. 123, 168 (1889) (Frankfurter, J., concurring); and then quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)).

The <u>Mathews</u> Court then identified three distinct factors to identify the specific dictates of due process for a given context: (1) the private interest that would be affected, (2) the risk of an erroneous deprivation under the procedure provided and the

- 11 -

probable value of additional or alternative procedural safeguards, and (3) the governmental interest that would be impacted by additional or alternative procedural requirements.  Id. at 335.  Applying those factors to the Marchman Act's involuntary assessment and stabilization procedure will demonstrate how the procedure falls short of due process' requirements.

A.

Again, there is no argument about the liberty interest at stake here or its magnitude.  The question T.L. presented really revolves around the temporal intersection between one's due process right to be heard "at a meaningful time and in a meaningful manner," Armstrong, 380 U.S. at 552, and the ex parte assessment and stabilization procedures of the Marchman Act.  Though our courts have not squarely resolved this issue, we do have guidance.  The dictates of due process are, of course, flexible,[5] but as a general rule, an opportunity to be heard must be extended prior to the government's deprivation of a constitutionally protected liberty interest.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) ("We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971))); Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at

---

[5]See Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 454 (1985) ("The requirements of due process are flexible and depend on a balancing of the interests affected by the relevant government action." (citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961))).

a minimum they require that deprivation of life, liberty[,] or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."). Construing the commitment procedures of Florida's Baker Act[6] (an act that shares many similarities with the Marchman Act), the Eleventh Circuit Court of Appeals echoed these observations, noting that the protection of due process requires "in most cases that a person be accorded some type of hearing before being committed to a mental institution."  Burch v. Apalachee Cmty. Mental Health Servs., Inc., 840 F.2d 797, 800 (11th Cir. 1988).  "In limited cases," the Burch court explained, "due process permits a period of involuntary commitment prior to a hearing as long as a hearing is held shortly after the initial detention."  Id.[7]  See also Jordan by Jordan v. Jackson, 15 F.3d 333, 349 (4th Cir. 1994) ("Promptness is the touchstone of the Fourteenth Amendment analysis into the timeliness of post-deprivation review, as well as the Fourth Amendment inquiry into the constitutionality of delay in an independent probable cause determination.").

How long can that initial hearing be delayed?  Given what is at stake, the operative terms "shortly" and "prompt" are apt descriptions for the hearing the Constitution requires of the Marchman Act's ex parte assessment and stabilization procedure, and they are terms that ought to be measured in hours, perhaps as much as a day or two, but certainly not a week.  Cf. Gerstein v. Pugh, 420 U.S. 103, 114 (1975) (holding that Fourth Amendment requires a judicial determination of probable cause as

---

[6]See §§ 394.451-.47892, Fla. Stat. (2017) (providing for civil commitment for mental healthcare or treatment).

[7]Because the appellant in Burch did not challenge the constitutionality of the commitment procedure at issue, the court assumed, without deciding, that they complied with procedural due process.  See 840 F.2d at 801 n.8.

- 13 -

a prerequisite to an extended, postarrest detention, and remarking that "[o]nce the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. . . . And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly."); United States v. Briggs, 697 F.3d 98, 103 (2d Cir. 2012) ("We have often affirmed that the Constitution imposes no bright-line limit on the length of pretrial detention. But we have also stressed that very long detentions must be exceptional. . . . [F]or every set of circumstances, due process does impose some limit." (citation omitted)). I reach this conclusion by examining the second and third Mathews factors.

B.

By its very nature, the Marchman Act's ex parte assessment and stabilization procedure creates a significant risk of an erroneous deprivation of an individual's liberty. The statutory procedure at issue here is an ex parte, in camera review of a written petition, a kind of proceeding that has long been decried for its constitutional shortcomings. See generally Doe v. Hampton, 566 F.2d 265, 276 (D.C. Cir. 1977) ("[A]s a general rule, ex parte communications . . . to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process."); RZS Holdings AVV v. PDVSA Petroelo S.A., 506 F.3d 350, 356-57 (4th Cir. 2007) ("It is settled beyond peradventure that, in our system of justice, ex parte judicial proceedings . . . are greatly disfavored. The conduct of such proceedings present substantial due process concerns, and our courts are necessarily and properly reluctant to participate in them."); In re Taylor, 567 F.2d 1183, 1187-88 (2d

- 14 -

Cir. 1977) ("In camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process, i.e., notice setting forth the alleged misconduct with particularity and an opportunity for a hearing." (first citing <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974); and then citing <u>Bodie</u>, 401 U.S. 371)); <u>United States v. Napue</u>, 834 F.2d 1311, 1318-19 (7th Cir. 1987) ("[Ex parte proceedings] should be avoided whenever possible and, even when they are appropriate, their scope should be kept to a minimum. . . . Even where the government acts in good faith and diligently attempts to present information fairly during an ex parte proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate." (emphasis omitted) (citations omitted)). Under this procedure of the Marchman Act, anyone who can claim "direct personal knowledge of the respondent's substance abuse impairment," § 397.695(1), can instigate the court's issuance of an ex parte order,[8] and that order will be issued and executed without considering any evidence or argument apart from the petition. No one other than the named respondent is notified that a court has ordered his or her seizure and involuntary confinement, which makes it highly unlikely that a third party who is familiar with that person's circumstances can intercede to dissuade the court from

_____

[8]Interestingly, a prior version of the statute limited Marchman Act petitions to those filed by "any three adults who have personal knowledge of the respondent's substance abuse impairment." § 397.6811(1), Fla. Stat. (2015). Not that due process should be predicated on a show of hands; whether one's liberty is taken on the petition of one person, or three people, or a crowd's, a person should have a right to test the petition's allegations in a prompt judicial hearing. But the fact that an ex parte order can issue on the unsubstantiated claim of a single, unrelated individual (as opposed to three) would only seem to magnify the likelihood that a Marchman Act respondent could be erroneously seized and confined under the current version of the statute.

issuing an order or rescinding it if it has already been entered. And in the ensuing days of the initial assessment and stabilization, the confined individual will be neither seen nor heard by a neutral magistrate of the court. What precedes five or more days of involuntary confinement under this provision of the Marchman Act, then, is a procedure that, to a considerable degree, will be determined by a written accusation in a court file—which amounts to little more than "j'accuse."

One might whistle past this dearth of due process with the assurance that the extendable 72-hour "qualified professional" assessment under section 397.6819 offers some constitutional cover for the ex parte procedure's constitutional shortcomings. It does not. First, the assessment itself, and whatever it may entail, is not defined in the Marchman Act. Whatever it is, it is obviously not a judicial or quasi-judicial hearing—which is what due process ordinarily demands. See Goldberg v. Kelly, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); cf. United States v. Rehlander, 666 F.3d 45, 48 (1st Cir. 2012) ("Ordinarily, to work a permanent or prolonged loss of constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required."). Second, the qualified professional conducting the assessment is not a judicial officer or magistrate. See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 617 (1993) (noting that "due process requires a 'neutral and detached judge in the first instance' " (quoting Ward v. Village of Monroeville, 409 U.S. 57, 61-62 (1972))); cf. Lecates v. Justice of the Peace Court No. 4 of State of Del., 637 F.2d 898, 910 (3d Cir. 1980) ("A judge devoid of training in the

- 16 -

complexities of the law, the subtleties of legal reasoning, or the methodology of legal research may tend to decide each matter according to personal predilection or assumption. The command of statutes and the teachings of precedents may well be ignored in such a process." (footnote omitted)). Third, the qualified professional is not directed to conduct his or her assessment, nor issue a recommendation, in a manner that a judicial officer would when presiding over a hearing, as, for example, in a quasi-judicial forum. See Jennings v. Dade County, 589 So. 2d 1337, 1340 (Fla. 3d DCA 1991) (observing that "certain standards of basic fairness must be adhered to" in quasi-judicial proceedings and explaining that "[c]onsequently, a quasi-judicial decision based upon the record is not conclusive if minimal standards of due process are denied"); Kimbrough v. O'Neil, 523 F.2d 1057, 1062 (7th Cir. 1975) (Swygert, J., concurring) ("The very concept of procedural due process presupposes that the substantive decision-making will be based on some lawful rule or system of rules . . . ."). And a reviewing court (if a case is eventually brought before it) will be left in the dark about what the qualified professional may have considered because the Marchman Act does not provide for a transcript or meaningful record of the qualified professional's assessment. Cf. Specht v. Patterson, 386 U.S. 605, 610 (1967) (listing requirements of due process in civil commitment proceedings as including the right to be present with counsel, to be heard, to confront and cross-examine witnesses, to offer evidence, and that "there must be findings adequate to make meaningful any appeal that is allowed"); Marincas v. Lewis, 92 F.3d 195, 203 (3d Cir. 1996) (observing that federal asylum procedures for stowaways were "particularly troubling" because they failed to provide

- 17 -

"the most basic of due process protections—a neutral judge and a complete record of the proceeding").

None of which is meant to slight the importance of the qualified professional's service. Physicians, psychologists, social workers, and Department-certified therapists may be eminently qualified to assess and opine upon mental health and substance abuse issues. These professionals are uniquely trained in the perception of human conduct. Their opinions and testimony in Marchman Act proceedings will often be invaluable to a court.[9] But they are not a court unto themselves. Cf. Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested *tribunal* in both civil and criminal cases." (emphasis added)); De Clements v. De Clements, 662 So. 2d 1276, 1283 (Fla. 3d DCA 1995) (observing that "the trial judge is the only elected constitutional officer with the organic right to determine a litigant's case"). A psychologist cannot be constitutionally empowered to order confinement under a Marchman Act proceeding, any more than a criminologist could be authorized to order conditions for pretrial release in a criminal proceeding. The distinction—between expert adviser and lawful decider—is a vital one, because our constitutional order does not endow private third parties with the power to dispense with due process against another's liberty, no matter how impressive that third party's credentials or college

---

[9]Invaluable, not infallible. See Alexander Tsesis, Due Process in Civil Commitments, 68 Wash. & Lee L. Rev. 253, 257 (2011) (describing "repeated empirical findings that show psychiatrists are no better at predicting dangerous behaviors than untrained people").

- 18 -

degrees might seem.[10] See Vitek, 445 U.S. at 495 (holding that incarcerated prisoners must be afforded a hearing before being transferred to a mental hospital, observing that even though determining an inmate's mental health may be an "essentially medical" inquiry, that "does not justify dispensing with due process requirements"); cf. Cal. Pac. Bank v. Fed. Deposit Ins. Corp., 885 F.3d 560, 572 (9th Cir. 2018) ("[W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." (alteration in original) (quoting Hannah v. Larche, 363 U.S. 420, 442 (1960))).

"[T]he citizens of a free society can conceive of no greater injury than the continued unjust deprivation of liberty." Rowell v. Holt, 850 So. 2d 474, 480 (Fla. 2003). Because physical liberty is at stake, the value of imposing the minimum that due process would require for its deprivation—a preliminary hearing before a judicial officer or magistrate—well exceeds what the Marchman Act's ex parte, in camera determination and qualified professional assessment provides.

---

[10]To be sure, the Fifth and Fourteen Amendments will allow certain property rights, such as, for example, state licenses to practice a profession or trade, to be affected by nonjudicial boards, committees, or arbiters. The character of a licensure interest in gainful employment is categorically distinct from the interest one has in being free from physical restraint. The latter, in my opinion, falls solely within the nondelegable power and duty of a constituted court to determine. See In re Beverly, 342 So. 2d 481, 489 (Fla. 1977) ("The seriousness of the deprivation of liberty and the consequences which follow [an] adjudication of mental illness make imperative strict adherence to the rules of evidence generally applicable to other proceedings in which an individual's liberty is in jeopardy."); cf. Ward, 409 U.S. at 61 (finding statutes authorizing mayors to sit as judges over ordinance violations and traffic offenses facially unconstitutional and rejecting argument that the right to appeal to a county court of common pleas was a sufficient procedural safeguard: "Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication").

C.

Turning now to the third Mathews factor, I do not believe the State has a compelling interest that can justify the Marchman Act's prolonged delay between an initial confinement for assessment and stabilization and a preliminary judicial hearing. That conclusion stems from how I perceive the precise nature of the State's interest that the involuntary assessment and stabilization provisions would serve.

It is true that the State has an interest, a significant interest, as part of its public police powers, to provide protection to T.L. and the community from the risk of harm T.L. might have posed due to her alleged addiction to drugs or alcohol. Public health and safety are why we have a Marchman Act and why that act authorizes extended, involuntary treatment of individuals who suffer from severe substance abuse addiction at licensed treatment facilities. See §§ 397.693-.6978; see also Sweat v. Turpentine & Rosin Factors, 150 So. 617, 618 (Fla. 1933) ("It is well settled that the exercise of police power is confined to those acts which may reasonably be construed as being expedient at least for the protection of public safety, public welfare, public morals, or public health."). But framing the State's interest in that manner conflates separate sections in the Marchman Act and the separate concerns those sections address. See Cole v. State, 714 So. 2d 479, 482 (Fla. 2d DCA 1998) ("Part V of the Marchman Act authorizes two kinds of court ordered involuntary admissions, one for assessment and stabilization, and one for treatment."). The interests implicated in T.L.'s petition do not touch upon the prolonged involuntary treatment that the Marchman Act authorizes (following a hearing), but rather, only the immediate management of an alleged threat to safety (before a hearing can be commenced). The discrete ex parte

- 20 -

assessment and stabilization procedures under sections 397.6811-397.6821 are what I am concerned with here.  The pertinent State interest must be considered in those terms, and that interest is quite limited.

When an ex parte order issues under section 397.6815(2), *the State's only interest is to assuage an immediate safety threat until a hearing can be convened*.[11] Once a respondent in a Marchman Act petition is taken into custody so that he or she can no longer harm anyone and the respondent's condition is sufficiently stabilized so that he or she could be presented before a tribunal, once that has transpired, the State's interest in continuing to confine the respondent without a hearing vanishes.  See Gerstein, 420 U.S. at 114; Briggs, 697 F.3d at 103; Jackson, 15 F.3d at 349.

It is striking to me that in this case the State never even attempted to articulate an interest it might have had in continuing to hold T.L. for assessment and stabilization for five or more days at a time without giving her a preliminary hearing.  I suspect that is because there is none to be stated.[12]  All the State can say is that this proceeding is civil in nature and its purpose is therapeutic rather than penal.  Cf. Goetz v. Crosson, 967 F.2d 29, 34 (2d Cir. 1992) (observing "the dual goals of involuntary

---

[11]Presumably, the legislature recognized as much since the involuntary assessment and stabilization procedure under the Marchman Act provides for a hearing, eventually, before a court of law.  There is no legislative finding or statutory pronouncement addressing why such a substantial delay is necessary before convening a hearing.

[12]One could surmise that providing preliminary hearings more expediently following a respondent's initial, ex parte confinement under the Marchman Act would impose some additional financial cost; but the financial burden of providing judicial officers and lawyers to comply with the dictates of due process will not justify an otherwise unconstitutional deprivation of due process.  Cf. Gideon v. Wainwright, 372 U.S. 335, 351 (1963) (Harlan, J., concurring) (noting that state courts are "charged with the front-line responsibility for the enforcement of constitutional rights").

commitment—to provide care and treatment to those unable to care for themselves and to protect the individual and society from those who pose a danger to themselves and others because of mental illness").  Which is all well and good.  But the State's underlying motive for depriving women and men of their physical liberty cannot become the sole measure of due process.  Indeed, the notion that your constitutional right to due process depends solely upon your government's intentions ought to be a frightening one, not least because of how easily it removes the individual from his or her constitutional right by reducing the right to a utilitarian function of a governmental agency's calculation.  Besides, I rather doubt that it matters much to those who have been taken into custody against their will and confined for days at a time without a hearing that the State believes the confinement will probably be for their own good.  Cf. Lavender v. State, 889 So. 2d 882, 885 (Fla. 5th DCA 2004) ("Even in civil commitment proceedings, '[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' " (alteration in original) (quoting Foucha, 504 U.S. at 80)).

Applying the three Mathews factors to the initial commitment and stabilization procedures of the Marchman Act leads me to an inescapable conclusion: the five or more day delay between confinement and a hearing under section 397.6815(2)'s ex parte procedure violates due process under the Fourteenth Amendment.

III.

At this point, it would be appropriate to reconcile the foregoing observations with two of the more notable published opinions on this important issue.

- 22 -

A.

The first case that must be considered—and, in my opinion,

distinguished—is Parham v. J.R., 442 U.S. 584 (1979), which was without question a

seminal decision defining the intersection between law and mental health.  See

generally Robert S. Berger, The Psychiatric Expert as Due Process Decisionmaker, 33

Buff. L. Rev. 681, 684 (1985).  In Parham, minor children who had been admitted into

Georgia mental health hospitals brought a class action under 42 U.S.C. § 1983 seeking

declaratory and injunctive relief.  442 U.S. at 587-88.  They argued that Georgia's

statutory procedures for admitting and holding children for mental health treatment

without an adversarial hearing violated the Due Process Clause of the Fourteenth

Amendment.  Id. at 588.

The opening line of the opinion set a critical boundary for both the issue

before the Parham Court and the resolution of that issue: "The question presented in

this appeal is what process is constitutionally due a minor child *whose parents or*

*guardian seek state administered institutional mental health care for the child* and

specifically whether an adversary proceeding is required prior to or after the

commitment."  Id. at 587 (emphasis added).[13]  The presence—and influence—of a

parent or guardian in the measurement of due process becomes a predominant theme

throughout the holding.

_____

[13]The pertinent statutes provided that parents or guardians could apply to have their children voluntarily admitted for hospitalization, Ga. Code Ann. § 88-503.1(a) (1975); that a superintendent of a hospital could temporarily admit such children for "observation and diagnosis," and, if appropriate, subsequently admit them for further treatment, id.; and that the parents or guardians could have their children discharged at their request if their child had been hospitalized for more than five days, § 88-503.3.

Parham framed its analysis by the "general approach for testing challenged state procedures under a due process claim," the three Mathews factors. Id. at 599. Addressing the first factor, the child's interest, the Parham Court observed: "We must consider first the child's interest in not being committed. *Normally, however, since this interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child, the private interest at stake is a combination of the child's and parents' concerns*." Id. at 600 (emphasis added). Those "inextricably linked" interests prompted lengthy reflections about the role of parents and guardians in children's lives from the Parham Court:

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.

Id. at 602 (alteration in original) (citations omitted).

Indeed, the Parham court rejected the argument to uncouple children's liberty interests from their parents' decision-making authority in defining due process:

> Appellees urge that these precedents limiting the traditional rights of parents, if viewed in the context of the liberty interest of the child and the likelihood of parental abuse, require us to hold that the parents' decision to have a child admitted to a mental hospital must be subject to an exacting constitutional scrutiny, including a formal, adversary, pre-admission hearing.

- 24 -

Appellees' argument, however, sweeps too broadly. Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. . . . Neither state officials nor federal courts are equipped to review such parental decisions.

Id. at 603-04. Parham then concluded,

[i]n defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply.

Id. at 604; see also In re F.C. III, 2 A.3d 1201, 1218-21 (Pa. 2010) (relying on Parham to uphold Pennsylvania Drug and Alcohol Abuse Control Act, which permits parents and guardians to petition to have their drug or alcohol dependent children committed for treatment subject to a forty-five-day review).[14]

It was with that preface, and in that carefully defined context, that Parham made the observation: "[f]or 'neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments.' Thus, a staff physician will suffice, so long as he or she is free to evaluate independently the child's mental and emotional condition and need for treatment." Id. at 607 (quoting In re Roger S., 569

---

[14]The constitutional challenge the fourteen-year-old child appellant in F.C. III raised occurred in the course of a judicial hearing that preceded the order for the child's inpatient commitment. 2 A.3d at 1205. In fact, the certified addiction counselor who first diagnosed F.C. III as cannabis dependent testified before a judge of a Pennsylvania Court of Common Pleas and was subject to cross-examination prior to the court issuing its order. Id. at 1205-06. Thus, the case is inapposite to T.L.'s due process arguments.

P.2d 1286, 1299 (Ca. 1977) (Clark, J., dissenting))). The Court in Parham allowed that the "thorough psychiatric investigation . . . followed by additional periodic review of a child's condition" met the requirements of due process—but tethered that conclusion to the involvement and intertwined interests of the minor child's parents or guardians. Id. at 613. "We are satisfied that such procedures will protect the child from an erroneous decision in a way that neither unduly burdens the states *nor inhibits parental decisions to seek state help.*" Id. at 607 (emphasis added).

In my view, it is simply impossible to read Parham's pronouncements about the psychiatrist's role in ensuring due process for hospitalized children apart from the inextricably linked interests of parents and guardians who want their children hospitalized. Accord Vitek, 445 U.S. at 494-95 (affirming due process protections fashioned by a district court for prisoners being transferred to a mental hospital, including prior written notice, a hearing, an opportunity to present testimony and to cross-examine witnesses, an independent decisionmaker, a written statement by the decisionmaker, appointment of counsel, and notice of the rights); Addington, 441 U.S. at 428-29 (noting that "the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected"). To pull Parham's remarks about the role of "psychiatric judgments" in due process into any other context unmoors the holding and severs the Court's analysis from the anchor of its premise.

The only court decision I have found that has upheld anything similar to the Marchman Act's involuntary assessment and stabilization procedure for an emancipated adult is the Supreme Court of Alaska's opinion, In re Daniel G., 320 P.3d

- 26 -

262 (Alaska 2014).[15]  In Daniel G, the court concluded that Alaska's emergency

psychiatric detention and evaluation statutes satisfied the Mathews test of due process

because the risk of an erroneous deprivation was "relatively low," a pre-evaluation

hearing "could not occur as quickly as an ex parte order," which might lengthen an

unnecessary confinement, and the State had a "strong interest in obtaining a prompt

psychiatric evaluation of a respondent who has been detained on an emergency basis."

320 P.3d at 272-73.  I do not find this decision especially persuasive, however, because

the Daniel G. court's application of the Mathews factors was not especially rigorous.

For example, Daniel G.'s pronouncement that there was a "relatively low"

risk of an erroneous deprivation of the appellant's liberty by virtue of a "disinterested

medical staff" review is startlingly juxtaposed against the acknowledgement (in the

same paragraph) that these "preliminary determinations may be incorrect and result in

unnecessary 72-hour evaluations."  Id. at 272.  The court ultimately resolved this factor

with the assurance that since some evaluation periods might be completed before

seventy-two hours, some people might be freed more expediently.  Id.  Which may be

---

[15]The statutory scheme at issue in Daniel G. required

> that a person who is detained for a psychiatric emergency be
> examined and evaluated by a mental health professional and
> a physician within 24 hours of arrival at an evaluation facility.
> If, after the initial emergency examination, the mental health
> professional has reason to believe the person is "(1)
> mentally ill and that condition causes the respondent to be
> gravely disabled or to present a likelihood of serious harm to
> self or others, and (2) is in need of care or treatment," then
> [Alaska Stat. §] 47.30.710(b) permits the mental health
> professional to arrange for the hospitalization of that person
> for evaluation on "an emergency basis."

320 P.3d at 269 (footnote omitted) (quoting Alaska Stat. § 47.30.710(a)).

true, but for those who would remain confined without the hearing due process requires, the point that others could be released more quickly becomes something of a non sequitur. The Daniel G. court also asserted "as a practical matter" that pre-evaluation hearings could not occur as quickly as ex parte orders, which could, in turn, "*lengthen* a respondent's unnecessary confinement beyond 72 hours." Id. at 273. To my mind, that puts the matter upside down. Due process cannot turn on the assumption that the State may deprive first and have a hearing later simply because it may be faster and easier to do so on an ex parte basis. Just the opposite. It is the very propriety of the ex parte order that is at issue and which must stand or fall beneath due process' strictures.

Moreover, the practical observation Daniel G. made in this regard does not align with one I would offer in its stead: every day in Florida, hundreds of detained men and women are afforded preliminary hearings within twenty-four hours of their arrest on criminal charges. I can think of no reason (and the State has not offered one in response to T.L.'s petition) why a similar hearing could not be afforded to those who have been involuntarily seized and transported to a secure facility for assessment under the Marchman Act.

Finally, Daniel G. dispenses with the third Mathews factor by miscasting the nature of the State's interest. According to Daniel G., the State has an interest "in obtaining a prompt psychiatric evaluation of a respondent who has been detained on an emergency basis to determine if civil commitment is warranted," id., as if that were the same as the interest that is actually implicated by the individual's seizure and continued confinement without a hearing. They are not equivalent. As I touched upon in part II(C), when determining what process is due when the State deprives a person's

- 28 -

physical liberty prior to a hearing, the State's interest must bear some connection to why a hearing must be withheld. The interest in confining an individual without a hearing must be articulated as such—an interest that can only be met without providing a hearing—because, again, a hearing is the presumed constitutional norm for measuring what due process requires to restrain one's physical liberty. See RZS Holdings AVV, 506 F.3d at 356-57; Napue, 834 F.2d at 1318-19; In re Taylor, 567 F.2d at 1187-88; cf. Gannett Co. v. DePasquale, 443 U.S. 368, 420 (1979) (Blackmun, J., concurring); Boddie, 401 U.S. at 377; In re Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 667 So. 2d 195, 196 (Fla. 1996).

It is my belief that these two cases, although certainly worthy of consideration, are either inapt or fall short of the depth of scrutiny that must be given to due process under Mathews.

B.

There is a final point that should not be overlooked concerning the Marchman Act's involuntary assessment and stabilization procedures. The State is correct in its amended response that notwithstanding section 397.6815(2), which directs courts to refrain from appointing an attorney for a respondent prior to the initial assessment and stabilization, a respondent in a Marchman Act proceeding is constitutionally entitled to the appointment of counsel. The right to counsel in connection with the Marchman Act's involuntary assessment and stabilization procedure is, as the Third District put it, a "fundamental due process right[]." K.B. v. Fla. Dep't of Children & Families, 202 So. 3d 909, 912 (Fla. 3d DCA 2016); see also Albrechta, 841

So. 2d at 645 ("Because due process is implicated, we conclude that a defendant has a constitutional right to be represented by counsel in Marchman Act proceedings.").

Having recognized that component of due process for this statutory procedure, though, it seems hard to reconcile the absence of the concomitant component of a judicial hearing. How can a Marchman Act respondent have a right to counsel but not a preliminary court hearing? What are these respondents' lawyers supposed to do for their clients while their clients are confined for days for assessment and stabilization? The answer, it seems, is not much at all. I suppose the attorney could challenge the facial sufficiency of the ex parte petition.[16] But that seems a rather hobbled role for a lawyer, considering how the courts have traditionally defined the work of constitutionally appointed counsel. See, e.g., Entsminger v. Iowa, 386 U.S. 748, 751 (1967) ("[A]ppointed counsel must function in the active role of an advocate, as opposed to that of amicus curiae." (citing Ellis v. United States, 356 U.S. 674 (1958))); J.B. v. Fla. Dept. of Children & Families, 170 So. 3d 780, 785 (Fla. 2015) ("[W]e hold that the right to counsel in termination of parental right . . . proceedings includes the right to effective assistance and requires a means of vindicating that right."). Without a court hearing in which to present and challenge evidence, the lawyer's role in this Marchman Act proceeding (such as it is) becomes so cabined it scarcely resembles representation. For that reason as well, I believe due process requires some manner of a timely, preliminary hearing before a judge or magistrate so that appointed counsel can fully represent their clients' interests.

_____

[16]Commendably, T.L.'s appointed attorney has gone over and above that by bringing this petition and constitutional challenge to our court's attention.

IV.

In my opinion, the involuntary assessment and stabilization procedure of the Marchman Act appears to violate the constitutional right to due process under the Fourteenth Amendment. This procedure in the Marchman Act permits the State to take one of our most cherished freedoms, the freedom from physical restraint, for five or more days at a time with nothing more than an ex parte review of a paper application and a follow-up ex parte assessment by a third party. Due process requires more than that.

Although the civil nature of a Marchman Act proceeding differs from a criminal proceeding, the nature of the initial, prehearing deprivation of a respondent's liberty bears enough of a resemblance to the loss of freedom in a pretrial arrest for a criminal case (from the perspective of the seized individual), that I believe it is appropriate to measure the baseline of a respondent's right to due process in similar dimensions. That is, once any constitutionally recognized threats such as public or personal safety have been mitigated, the State has no further legitimate interest in confining respondents against their will without affording them a preliminary hearing. The State must then provide what the constitution demands—a prompt preliminary hearing before a judicial officer.

Therefore, I am of the opinion that an ex parte order authorizing an adult respondent's seizure under section 397.6815 must be subject to a return hearing before a judicial officer for the purpose of determining whether the ex parte order for assessment and stabilization was properly entered and whether there are sufficient factual grounds under section 397.675 to confine the respondent for assessment and

stabilization on a preliminary basis.  In my opinion, due process requires such a hearing within 48 hours of the respondent's seizure and confinement, unless the respondent either waives the right to a hearing or is physically incapable of making an appearance. Cf. County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991) (holding that probable cause hearings held within 48 hours of arrest will generally comply with the Fourth Amendment).  I further believe that respondents appearing at such hearings must receive the full extent of due process rights afforded to anyone whose physical liberty has been deprived prior to a final adjudication, including the right to appointed counsel if indigent, the right to testify and present evidence, the right to cross-examine witnesses, and the right to a prompt, public hearing before a judicial officer where the State bears the burden of proof.  See Fla. R. Crim. P. 3.130; cf. United States v. Salerno, 481 U.S. 739, 751-52 (1987) (delineating rights afforded to pretrial detainees under the Bail Reform Act that allowed the statutory scheme to pass a due process challenge).

I will conclude with an observation, one that I am by no means the first to make: those who suffer from addiction need a kind of help that most courts are not very well suited to provide.  But until a more holistic approach emerges to confront this public health epidemic,[17] it falls to the court system to address, as best it can, the profound psychological and sociological problems of addiction.  In meeting this task, though,

---

[17]See Lawrence Scholl, PhD, et al., Drug and Opioid-Involved Overdose Deaths—United States, 2013-2017, Centers for Disease Control and Prevention (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm (observing that "[t]hrough 2017, the drug overdose epidemic continues to worsen and evolve").

there is a point where courts cannot bend, or else they will cease to be courts.  Seizing and confining people without due process takes us to that point.

CASANUEVA, Judge, Concurring with opinion.

I fully concur with this court's opinion dismissing this case as moot.  I write only to add another voice recognizing the tension created by the operation of a statute that is enforced by a judicial decree and results in the deprivation of a person's liberty. The desire to provide aid to those troubled by substance abuse must be balanced against the potential misuse of the law which could result in the improper deprivation of an individual's freedom.

In his concurring opinion, Judge Lucas raises a number of legal issues which merit consideration by not just members of the judiciary but also by those attorneys who undertake to represent those impacted by the Marchman Act.  To add a small measure of weight to his discussion, I join in sections IB and IIIB of his concurring opinion.